911 F.2d 1302
 Karen JOHNSON and Dorothy Pearson, Individually and on
Behalf of All Others Similarly Situated, Appellants,
v.
The UNITED STATES DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT (HUD); Jack Kemp, in His Official Capacity as
Secretary of HUD; Southern Commercial Bank, a Missouri
Banking Organization; Hillvale Associates, a Missouri
Limited Partnership; Medve-Wald Partnership, a Missouri
Limited Partnership; Rodan Management, Inc., a Missouri
Corporation, Appellees.
 No. 89-2853.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 13, 1990.
Decided Aug. 24, 1990.
Rehearing Denied Oct. 29, 1990.
 
 Ann B. Lever, St. Louis, Mo., for appellants.
 David T. Hamilton, St. Louis, Mo. and Scott R. McIntosh, Washington, D.C., for appellees.
 Before McMILLIAN and BEAM, Circuit Judges, and HEANEY, Senior Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 Plaintiffs, low income tenants in the Hillvale Apartment complex in St. Louis, Missouri, appeal from an order entered by the District Court for the Eastern District of Missouri granting summary judgment in favor of the owners of the apartment complex, the manager, the mortgagee and the United States Department of Housing and Urban Development (HUD). The controversy surrounds the correct interpretation of the Emergency Low Income Housing Preservation Act of 1987, Pub.L. No. 100-242, 101 Stat. 1877 (1988) (codified at 12 U.S.C. Sec. 1715l note), which governs the method by which private owners of housing financed under Sec. 221(d)(3) of the National Housing Act, 12 U.S.C. Sec. 1715l (d)(3) (1988), may terminate their obligation to provide low and moderate income housing. The precise question presented is whether the Preservation Act of 1987 covers termination by way of a mutual agreement between the owner of the property and the mortgagee to terminate federal mortgage insurance. We hold that the Preservation Act as originally enacted in 1987 applies to voluntary mortgage insurance termination, and therefore reverse the judgment entered by the district court and order that summary judgment be granted in favor of the plaintiffs. However, because our holding raises the issue of whether the Preservation Act infringes on Hillvale's rights under the fifth amendment of the United States Constitution, see infra Part III, we remand the case to the district court for resolution of that issue.
 
 I.
 
 2
 Plaintiffs, Karen Johnson, Dorothy Pearson and Yvonne Edmond, are low-income tenants in the Hillvale Apartment complex. The complex is owned by defendants Hillvale Associates and Medve-Wald Partnership and managed by defendant Rodan Management Incorporated. Southern Commercial Bank, also a named defendant in the case, is the current holder of a mortgage note on the property.
 
 
 3
 The Hillvale Apartment complex was financed under Section 221(d)(3) of the National Housing Act, 12 U.S.C. Sec. 1715l (d)(3). Pursuant to 12 U.S.C. Sec. 1715l(b) and (d)(5), the United States agreed to insure the mortgage on the property against default and to subsidize below-market interest rates in exchange for Hillvale's promise to abide by low income affordability restrictions set forth in a "regulatory agreement." See 12 U.S.C. Sec. 1715l (d)(3). The regulatory agreement governs such aspects of the landlord tenant relationship as the amount of rent a landlord can charge, 24 C.F.R. Sec. 221.530(a)(1)-(2) (1988), rent increases, 24 C.F.R. Sec. 245, subpart D (1988), and eviction procedures, 24 C.F.R. Sec. 247, subpart A (1988). The regulatory agreement remains in effect as long as HUD is the insurer, holder, or reinsurer of the mortgage, and automatically expires when the term of the mortgage expires. 24 C.F.R. Sec. 221.529 (1988).
 
 
 4
 HUD regulations promulgated pursuant to the National Housing Act of 1961 gave the private owner of section 221(d)(3) housing two ways of terminating the regulatory agreement before the expiration of the mortgage. The owner could either prepay the mortgage, or, with the consent of the mortgagee, terminate federal mortgage insurance. 24 C.F.R. Sec. 207.253(a), (b) (1988). Mortgage prepayment within the first twenty years of the life of the mortgage required HUD's approval. 24 C.F.R. Sec. 221.524(a)(2) (1988). After twenty years, the owner was free to prepay the remainder of the mortgage balance and release itself from the regulatory agreement without HUD's consent. 24 C.F.R. Sec. 221.524(a)(1)(ii). The owner's right to terminate federal mortgage insurance after obtaining the consent of the mortgagee was not restricted in the same way. Instead, Title 12 U.S.C. Sec. 1715t (Section 229 of the National Housing Act of 1959) authorized the Secretary to terminate a federal mortgage insurance contract upon the request of the owner or mortgagor and the lender or mortgagee at any time prior to the expiration of the mortgage. HUD interpreted this authorization as nondiscretionary, requiring HUD's approval whenever a request was brought by both the owner and the mortgagee. 24 C.F.R. Sec. 207.253(b).
 
 
 5
 In 1983 Congress limited HUD's authority to approve mortgage prepayment requests within the first twenty years of the life of the mortgage. Supplemental Appropriations Act, Pub.L. No. 98-181, Sec. 433, 97 Stat. 1153, 1221 (1983) (codified at 12 U.S.C. Sec. 1715z-15(a)). The 1983 legislation directed HUD to withhold consent to mortgage prepayment unless
 
 
 6
 (1) the Secretary has determined that such project is no longer meeting a need for rental housing for lower income families in the area;
 
 
 7
 (2) the Secretary (A) has determined that the tenants have been notified of the owner's request for approval of a prepayment; (B) has provided the tenants with an opportunity to comment on the owner's request; and (C) has taken such comments into consideration; and
 
 
 8
 (3) the Secretary has ensured that there is a plan for providing relocation assistance for adequate, comparable housing for any lower income tenant who will be displaced as a result of the prepayment and withdrawal of the project from the program.
 
 
 9
 12 U.S.C. Sec. 1715z-15(a) (1988). The 1983 legislation did not affect the owner's right to prepay without HUD's consent after twenty years and did not affect the right of the mortgagor and mortgagee to mutually terminate federal mortgage insurance.
 
 
 10
 On December 21, 1987, Congress passed the Preservation Act of 1987, Pub.L. No. 100-242, 101 Stat. 1877 (1988) (codified at 12 U.S.C. Sec. 1715l note) ("the Preservation Act"), the subject of dispute in this lawsuit. The Preservation Act was prompted by the prospect that nearly one million units of low income housing built in the 1960s would soon be eligible to be released from rent restrictions because of the expiration of the twenty-year moratorium on unilateral mortgage prepayment and the expiration of Section 8 rental assistance contracts. H.R.Conf.Rep. No. 426, 100th Cong., 1st Sess. 192, reprinted in 1987 U.S.Code Cong. & Admin.News 3317, 3458, 3489 (hereinafter cited as "Conference Report, ---- USCCAN ----"). To prevent a national crisis in the availability of low income housing, Congress passed a temporary measure making it more difficult for owners of Sec. 221(d)(3) housing to release themselves from the terms of the regulatory agreement. Conference Report, 1987 USCCAN 3490. In section 222 of the Preservation Act, Congress provided: "An owner of eligible low income housing seeking to initiate prepayment or other changes in the status or terms of the mortgage or regulatory agreement shall file with the Secretary a notice of the intent of the owner in such form and manner as the Secretary may prescribe." Preservation Act, Sec. 222, 101 Stat. 1879. The Preservation Act requires such owners to submit to HUD a "plan of action" detailing, among other things, the impact of such termination on the current tenants and the local supply of affordable housing. Id. Sec. 223(b), 101 Stat. 1879.[1] In lieu of approving the owner's request to terminate, HUD is authorized to offer the owner additional financial incentives to encourage the owner to remain in the program. Id. Sec. 224, 101 Stat. 1880.[2] A plan of action that requests termination of low income affordability restrictions may only be approved if HUD determines in writing, after considering the views of appropriate State and local agencies and the affected tenants, that implementation of the plan will not materially harm existing tenants and that sufficient housing exists in the community. Id. Sec. 225(a), 101 Stat. 1880.[3] Different approval criteria apply to a plan of action that includes additional financial incentives in lieu of termination. See id. Sec. 225(b), 101 Stat. 1881.
 
 
 11
 The Hillvale Apartment complex where plaintiffs reside was built during 1967 and 1968 and was not eligible for mortgage prepayment without HUD's approval until September 1988. Passage of the Preservation Act in 1987, however, made unilateral prepayment in September 1988 impossible. Believing that mortgage insurance termination was not covered by the Preservation Act, Hillvale and Southern Commercial Bank presented HUD with a request to terminate the mortgage insurance contract on the Hillvale Apartment complex pursuant to 12 U.S.C. Sec. 1715t. The request was made in April 1988. In July, HUD, which likewise interpreted the Preservation Act as applying only to mortgage prepayment and requests for additional financial incentives, approved Hillvale's request for termination pursuant to 24 C.F.R. Sec. 207.253(b) thereby releasing Hillvale from the restrictions on rent increases and other tenant protections contained in the regulatory agreement.
 
 
 12
 On October 24, 1988, the plaintiffs received notice of a 30-35% rent increase effective December 1, 1988. None of the plaintiffs can afford the rent increase and, for all three plaintiffs, the Hillvale complex is convenient to work and provides a stable environment for their children. Fearful that rent increases would force their eviction, plaintiffs filed the instant action seeking a rescission of the mortgage insurance termination, reestablishment of the restrictions contained in the regulatory agreement and a preliminary injunction to prevent Hillvale from enforcing rent increases, eviction notices or in any way changing the terms of the tenancy. Named as defendants were Hillvale and Medve-Wald as owners of the property, Rodan Management as manager of the property, Southern Commercial Bank as mortgagee, and HUD. Plaintiffs alleged that HUD approved Hillvale's request to terminate in violation of the Preservation Act and sought relief under the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A), (C) and (D) (1988) ("APA").[4] Specifically, plaintiffs asked the court to declare that HUD violated the APA and to order HUD to apply the Preservation Act to any attempt by Hillvale to prepay the mortgage, terminate federal mortgage insurance, or in any way terminate the low income affordability restrictions in the regulatory agreement. Plaintiffs also alleged that, regardless of the applicability of the Preservation Act to Hillvale's request, HUD abused its discretion in approving the request in violation of 5 U.S.C. Sec. 706(2)(A) and that, acting in concert, HUD and Hillvale denied plaintiffs due process of law in violation of the fifth amendment to the United States Constitution.
 
 
 13
 Plaintiffs filed, simultaneously with their complaint, a motion for a temporary restraining order and preliminary injunction. Hillvale then agreed to forbear any rent increases or eviction proceedings from December 1, 1988, until March 1, 1989, reserving the right to retroactively collect rent increases during that period should it prevail on the merits. By order of February 28, 1989, the district court made the forbearance agreement effective until a hearing on plaintiffs' motion for preliminary injunction.
 
 
 14
 On October 31, 1989, acting on cross motions for summary judgment, the district court granted summary judgment for the defendants. Johnson v. Department of Housing & Urban Development, 724 F.Supp. 1257 (E.D.Mo.1989). The district court held that the Preservation Act only imposes restrictions on mortgage prepayment and not on Hillvale's chosen method of termination. Id. at 1263-64. The district court also held that HUD did not abuse its discretion by granting Hillvale's request pursuant to HUD's authority under 12 U.S.C. Sec. 1715t and that plaintiffs' due process rights were not violated. Id. at 1264. The district court denied all outstanding motions as moot.[5] Id.
 
 
 15
 Plaintiffs filed a Notice of Appeal with this Court and moved the district court for an injunction pending appeal to prevent the eviction of Hillvale tenants for nonpayment of rent increases. The district court granted the injunction pending appeal, and, on February 15, 1990, we ordered that the district court's stay remain in effect until further order of this Court.
 
 
 16
 After the district court's decision, Congress passed and the President signed the Department of Housing and Urban Development Reform Act of 1989, Pub.L. No. 101-235, 103 Stat.1987 ("the Reform Act"). Section 202 of the Reform Act, entitled "Clarification of Applicability to Voluntary Termination of Insurance", amended the Preservation Act by explicitly including within its coverage mortgage insurance termination. Reform Act, Sec. 202, 103 Stat. 2037. Among the sections affected by the amendment is Section 222 which now reads:
 
 
 17
 An owner of eligible low income housing seeking to initiate prepayment or other changes in the status or terms of the mortgage or regulatory agreement (including a request to terminate the insurance contract pursuant to section 229 of the National Housing Act [section 1715t of this title] ) shall file with the Secretary a notice of intent of the owner in such form and manner as the Secretary shall prescribe.
 
 
 18
 12 U.S.C.A. Sec. 1715l note (Supp.1990) (underscored language added by the Reform Act, Sec. 202(c), 103 Stat. 2037).[6]
 
 
 19
 With this background in mind, we turn to the issue before us--whether Congress intended the Preservation Act as originally enacted in 1987 to apply to mortgage insurance termination.
 
 II.
 
 20
 The question presented by this case is a difficult one because nowhere in the Preservation Act did Congress specifically mention mortgage insurance termination. Congress did, however, make the Act applicable to mortgage prepayment and "other changes in the status or terms of the regulatory or mortgage agreement," Preservation Act, Sec. 222, 101 Stat. 1879, and evidenced an intent in language found elsewhere in the Act that it apply broadly to any termination of low income affordability restrictions. While the language of the Act suggests that Congress intended to cover mortgage insurance termination, the House Conference Report defines "other changes" as financial incentives offered to the owner in exchange for the owner's agreement to retain the housing for low to moderate income use, but does not mention mortgage insurance termination. Conference Report, 1987 USCCAN 3491. Recognizing the ambiguity in the language and legislative history of the 1987 Act, Congress amended the "other changes" language to make it clear that it includes mortgage insurance termination. Reform Act, Pub.L. No. 101-235, Sec. 202, 103 Stat. 1987. The amendment was designed to clarify the intent of the 1987 Congress and to make explicit what Congress intended when it originally passed the Preservation Act. 135 Cong.Rec. S16,597 (daily ed. Nov. 21, 1989) (section-by-section analysis); 135 Cong.Rec. H8605 (daily ed. Nov. 14, 1989) (remarks of Rep. Gonzalez).
 
 
 21
 The parties' arguments can be briefly summarized as follows. Plaintiffs urge us to give great weight to the clarifying language in the Reform Act of 1989 which indicates Congress intended the 1987 Preservation Act to include mortgage insurance termination. They argue that the clarifying language in the Reform Act comports with both the language and purposes of the 1987 Act. The private defendants, on the other hand, argue that the original language of the Preservation Act cannot reasonably be interpreted to include mortgage insurance termination, that Congress' subsequent declaration of intent in the Reform Act of 1989 is not a clarification of the 1987 Preservation Act, and, finally, that the Reform Act is not entitled to retroactive application.
 
 
 22
 After what the government concedes is a somewhat unusual change of position, HUD sides with the plaintiffs on appeal. In support of its motion for summary judgment before the district court, HUD argued that the Preservation Act applied only to mortgage prepayment and changes in the mortgage agreement involving additional financial incentives, not voluntary mortgage insurance termination. However, relying on Congress' enactment of the Reform Act after the district court's decision, HUD now argues that the Preservation Act always included within its scope the termination sought by the owners and mortgagee of the Hillvale complex. HUD admits that it did not comply with the Preservation Act by requiring Hillvale to submit a "notice of intent" and "plan of action," and therefore agrees with plaintiffs that the judgment in HUD's favor should be reversed.
 
 A.
 
 23
 Our objective in interpreting the Preservation Act is, of course, to achieve the intent of Congress. As evidence of Congressional intent we have before us such traditional sources as the language of the statute, its purposes and goals, and its legislative history. We also have the benefit of a clarifying amendment which purports to answer the very question presented by this litigation. The clarifying amendment, although enacted by a subsequent Congress, is evidence of what Congress intended when it passed the Preservation Act in 1987. Heckler v. Turner, 470 U.S. 184, 208-11, 105 S.Ct. 1138, 1151-53, 84 L.Ed.2d 138 (1985); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969); Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980); Porter v. Commissioner, 856 F.2d 1205, 1209 (8th Cir.1988); Whalen v. United States, 826 F.2d 668, 670 (7th Cir.1987); United States v. Northeastern Pharmaceutical & Chemical Co., 810 F.2d 726, 741 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); May Dept. Stores Co. v. Smith, 572 F.2d 1275, 1278 (8th Cir.) (per curiam), cert. denied, 439 U.S. 837, 99 S.Ct. 122, 58 L.Ed.2d 134 (1978). The clarifying amendment cannot override the "unmistakable intent of the enacting [Congress]," but is particularly persuasive evidence when that intent is ambiguous or obscure. Seatrain, 444 U.S. at 596, 100 S.Ct. at 813. Therefore, before deciding the issue presented on the basis of the intent expressed in the Reform Act, we must determine whether the language of the 1987 Act and its legislative history evidences an unmistakable intent on the part of Congress to exclude from the Act's coverage voluntary mortgage insurance termination.
 
 
 24
 The language of the statute and its contemporaneous legislative history do not evidence a clear and unmistakable intent to exclude from the Act's coverage voluntary mortgage insurance termination.[7] While not specifically referring to mortgage insurance termination, the Preservation Act does provide:
 
 
 25
 An owner of eligible low income housing seeking to initiate prepayment or other changes in the status or terms of the mortgage or regulatory agreement shall file with the Secretary a notice of the intent of the owner in such form and manner as the Secretary shall prescribe.
 
 
 26
 Preservation Act, Sec. 222, 101 Stat. 1879 (emphasis added). Voluntary mortgage insurance termination fits squarely within the scope of this section. Because it is a "change[ ] in the status" of both the regulatory and mortgage agreement, we could conclude, based on a literal application of the language in this section to the facts presented, that Congress indeed must have intended the Preservation Act to cover mortgage insurance termination. However, we cannot close our eyes to the House Conference Report which defines "other changes ..." more narrowly than its plain meaning might suggest:
 
 
 27
 The term "other changes" refers to changes related to an owner's acceptance of certain incentives in exchange for an agreement to retain the housing for low- and moderate-income use for the remaining term of the mortgage. Incentives which alter the current rent structure, for example, will necessitate amendments to the existing regulatory agreements. The conferees intend with this provision to affect only housing that is likely to prepay and do not intend to alter HUD administration of other regulatory agreements under the affected programs.
 
 
 28
 Conference Report, 1987 USCCAN 3491.
 
 
 29
 Even considering this more narrow definition of "other changes" in the legislative history, we are not convinced that Congress intended to exclude from the Act's coverage mortgage insurance termination. First, we note that the Conference Report does not indicate that "other changes" refers exclusively to additional financial incentives. Conference Report, 1987 USCCAN 3491. In addition, while the prospect that units built in the 1960s would soon be eligible for mortgage prepayment clearly prompted Congress' enactment of the Preservation Act, the language of the Act demonstrates Congress' broader concern over any termination of low income affordability restrictions. For instance, Section 223(b) requires that the plan of action include "a description of any proposed changes in the status or terms of the mortgage or regulatory agreement, which may include a request for incentives to extend the low income use of the housing." Preservation Act, Sec. 223(b)(1), 101 Stat. 1879 (emphasis added). And, the provision setting forth the criteria for HUD's approval of an owner's "plan of action" refers to a plan of action "involving termination of low income affordability restrictions," Preservation Act, Sec. 225, 101 Stat. 1880, which the Act specifically defines as "any elimination or relaxation of low income affordability restrictions," id. Sec. 233(7), 101 Stat. 1886 (emphasis added). Finally, Congress indicated in its findings that "in the next 15 years, more than 330,000 low income housing units insured or assisted under section 221(d)(3) and 236 of the National Housing Act could be lost as a result of the termination of low income affordability restrictions." Id. Sec. 202(a), 101 Stat. 1877 (emphasis added).
 
 
 30
 The purposes Congress sought to achieve by enactment of the Preservation Act also demonstrate Congress' concern over any termination of low income affordability restrictions and indicate Congress' intent that the Act cover mortgage insurance termination as well as mortgage prepayment. Congress passed the Preservation Act to forestall the sudden loss of low and moderate income housing until it could implement a comprehensive solution to the problem:
 
 
 31
 It is the purpose of this title (1) to preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately owned dwelling units that were produced for such purpose with Federal assistance; (2) to minimize the involuntary displacement of tenants currently residing in such housing; and (3) to continue the partnership between all levels of government and the private sector in the production and operation of housing that is affordable to low income Americans.
 
 
 32
 Preservation Act, Sec. 202(b), 101 Stat. 1878.
 
 
 33
 We believe that these statutory provisions together with the Act's purposes evidence Congress' intent to include within the scope of the Preservation Act any change the owner might seek in the terms of the regulatory agreement or in the owner's obligation under that agreement, which surely includes Hillvale's request to terminate federal mortgage insurance.
 
 B.
 
 34
 The Reform Act of 1989 removes any doubt we may still harbor as to whether Congress intended the Preservation Act to cover mortgage insurance termination and is a reliable indication of what Congress intended when it originally enacted the Preservation Act in 1987. Because the Reform Act is a subsequent legislative enactment, it is unlike the less formal types of subsequent legislative history which the Supreme Court has cautioned "provide an extremely hazardous basis for inferring the meaning of a Congressional enactment." Consumer Product Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980). In Consumer Product, the Supreme Court refused to give substantial weight to remarks made at a subsequent hearing and in a subsequent committee report about what Congress intended by an earlier enactment. Id. at 118, 100 S.Ct. at 2061. The Court specifically distinguished subsequent legislation declaring the intent of an earlier statute, acknowledging that in the case of clarifying legislation "Congress has proceeded formally through the legislative process" the therefore the subsequent legislation may be entitled to great weight. Id. at 118 n. 13, 100 S.Ct. at 2061 n. 13 (citing Red Lion Broadcasting Co. v. FCC, 395 U.S. at 380-81, 89 S.Ct. at 1801-02).
 
 
 35
 Hillvale argues that the Reform Act, even if clarifying, is not entitled to the weight normally given subsequent legislation because it was enacted in an expedited manner and sidestepped the committee process. We disagree. Although the Reform Act was passed on an expedited basis, it nevertheless proceeded "formally through the legislative process." Id. Furthermore, several members of the House and Senate specifically mentioned the clarifying amendment to the Preservation Act during the floor debate and therefore it cannot be said that the full Congress was unaware of its implications. 135 Cong.Rec. H8605 (daily ed. Nov. 14, 1989) (remarks by Rep. Gonzalez); id. S16,593 (daily ed. Nov. 21, 1989) (remarks by Sen. Cranston); id. S16,611 (remarks by Sen. Bond).
 
 
 36
 In the Reform Act, Congress amended the Preservation Act by including specific references to mortgage insurance termination. Congress made clear the amendment was clarifying in nature and not intended to effect a substantive change in the law. See United States v. Northeastern Pharmaceutical, 810 F.2d at 741 (rejecting an argument that an amendment substantially changed existing law rather than clarified it); Brown v. Marquette Sav. and Loan Ass'n, 686 F.2d 608, 615 (7th Cir.1982) (if Congress intended to change the law rather than clarify it, the previous statute meant exactly the contrary of the amended provision). The amendment is entitled "Clarification of Applicability to Voluntary Termination of Insurance", and the following remark by one of the Reform Act's sponsors is typical of remarks made about the amendment during its debate:
 
 
 37
 Title II contains provisions relating to emergency low-income housing preservation including the extension of the prepayment moratorium until September 30, 1990, applies the prepayment requirements to the voluntary termination of insurance, prohibits prepayment of rural housing loans and provides equity takeout incentives for new rural housing loans. We always intended that the 1987 Preservation Act was applicable to any termination of low-income occupancy use restrictions, by whatever means, including the termination of mortgage insurance, changes in the regulatory agreement or prepayment of the mortgage. We are aware that several such terminations have occurred and it is the Congress' position that they are contrary to the act. This amendment was necessary only to clarify what was intended by the passage of the original 1987 Housing Act.
 
 
 38
 135 Cong.Rec. H8605 (daily ed. Nov. 14, 1989) (remarks by Rep. Gonzalez) (emphasis added). The strong pronouncements by the Reform Act's sponsors that the clarifying amendment was necessary because Congress never intended to allow "a termination of insurance [to] be used to evade prepayment restrictions," 135 Cong.Rec. H9685 (daily ed. Nov. 21, 1989) (remarks by Rep. Gonzalez), remove any doubt as to the original intent of Congress.
 
 C.
 
 39
 After reviewing all the evidence of Congressional intent at our disposal, we conclude that the Preservation Act as originally enacted in 1987 applies to mortgage insurance termination. We base our conclusion on the express terms of the 1987 Act, its purposes, and the clarifying amendment in the Reform Act of 1989. While we are aware that there may be situations where Congress' purported clarification of an earlier enactment should not be considered probative of Congress' earlier intent, such a situation does not present itself here. We therefore reverse the district court's interpretation of the Preservation Act, made without the benefit of Congress' clarification, and order that summary judgment be granted for plaintiffs on their claim that HUD's approval of Hillvale's request to terminate was "without observance of procedure required by law." 5 U.S.C. Sec. 706(2)(D). Plaintiffs are entitled to a declaration that HUD violated the APA when it approved Hillvale's request without complying with the Preservation Act and an order requiring HUD to apply the Preservation Act to any request by Hillvale to either prepay the mortgage or terminate federal mortgage insurance.
 
 III.
 
 40
 Because we hold that the Reform Act clarified rather than changed the Preservation Act, the amendment in the Reform Act regarding mortgage insurance termination dates back to the Preservation Act of 1987 and we need not address any issue of retroactivity. We do, however, recognize that Hillvale may have a cause of action for damages against HUD under the fifth amendment because of the 1987 changes restricting the method by which Hillvale may terminate its obligations under the regulatory agreement. Without expressing any opinion on the merits of such a claim, we acknowledge that the fifth amendment may be implicated because, prior to the Preservation Act, Hillvale had the option of terminating the federal mortgage insurance contract pursuant to 12 U.S.C. Sec. 1715t and 24 C.F.R. Sec. 267.253(b). See Orrego v. HUD, 701 F.Supp. 1384, 1395-97 (N.D.Ill.1988) (holding that the Preservation Act violates neither the fifth amendment's due process nor takings clauses). Hillvale presented this argument to the district court in its motion for summary judgment and to this court during oral argument. We think it wise to settle this issue now rather than postpone its resolution for a later time. But see Thetford Properties v. HUD, 907 F.2d 445 (4th Cir.1990) (dismissing a similar claim for failure to exhaust administrative remedies). Therefore, we remand the case to the district court for resolution of Hillvale's claim that the Preservation Act of 1987 violates the fifth amendment's prohibition on government taking of private property without due process or just compensation.
 
 
 
 [1]
 This section provides that the plan of action should include:
 (1) a description of any proposed changes in the status or terms of the mortgage or regulatory agreement, which may include a request for incentives to extend the low income use of the housing;
 (2) a description of any assistance that could be provided by State or local government agencies, as determined by prior consultation between the owner and any appropriate State or local agencies;
 (3) a description of any proposed changes in the low income affordability restrictions;
 (4) a description of any change in ownership that is related to prepayment;
 (5) an assessment of the effect of the proposed changes on existing tenants;
 (6) a statement of the effect of the proposed changes on the supply of housing affordable to lower and very low income families or persons in the community within which the housing is located and in the area that the housing could reasonably be expected to serve; and
 (7) any other information that the Secretary determines is necessary to achieve the purposes of this title.
 
 
 [2]
 The House Conference Report makes clear that the Preservation Act applies to owner requests for additional financial incentives. It specifically refers to the "other changes ..." clause in Section 222 as including
 changes related to an owner's acceptance of certain incentives in exchange for an agreement to retain the housing for low- and moderate-income use for the remaining term of the mortgage.
 H.R.Conf.Rep. No. 426, 100th Cong.1st Sess. 194, reprinted in 1987 U.S.Code Cong. & Admin.News 3458, 3491.
 
 
 [3]
 The Secretary must find that:
 (1) implementation of the plan of action will not materially increase economic hardship for current tenants or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available; and
 (2)(A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect
 (i) the availability of decent, safe, and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve;
 (ii) the ability of lower income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or
 (iii) the housing opportunities of minorities in the community within which the housing is located; or
 (B) the plan has been approved by the appropriate State agency and any appropriate local government agency for the jurisdiction within which the housing is located as being in accordance with a State strategy approved by the Secretary under section 226.
 
 
 [4]
 We need not decide whether the Preservation Act impliedly grants plaintiffs a cause of action to enforce its requirements because they have a cause of action against HUD under the Administrative Procedure Act, 5 U.S.C. Sec. 702 (1988) ("APA"). See Orrego v. HUD, 701 F.Supp. 1384, 1392-93 (N.D.Ill.1988) (holding in dicta that low income tenants have an implied cause of action under the Preservation Act). Federal subject matter jurisdiction over plaintiffs' APA claim is conferred by 28 U.S.C. Sec. 1331 (1988). See Califano v. Sanders, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977) (Section 10 of the APA, 5 U.S.C. Sec. 702, is not an independent grant of subject matter jurisdiction)
 
 
 [5]
 Plaintiffs' Motion for Class Certification was pending before the district court when summary judgment was granted for defendants. The district court denied the motion as moot in light of its holding on the merits of plaintiffs' allegations. We believe that plaintiffs' Motion for Class Certification is also moot in light of our holding that summary judgment should be granted for plaintiffs. The injunctive relief sought by the plaintiffs will prevent Hillvale from increasing rents or in any way violating the terms of the regulatory agreement until its request to terminate is reviewed and approved by HUD and will benefit all low and moderate income tenants in the Hillvale complex. We do not believe the other tenants in the Hillvale complex will be prejudiced in any way by not joining the instant litigation either as a class or individually. Therefore a remand on the issue of class certification is unnecessary
 
 
 [6]
 In addition, section 221(a) of the Preservation Act now reads:
 An owner of eligible low income housing may prepay, and a mortgagee may accept prepayment of, a mortgage on such housing only in accordance with a plan of action approved by the Secretary of Housing and Urban Development under this subtitle. An insurance contract with respect to eligible low-income housing may be terminated pursuant to section 229 of the National Housing Act [section 1715t of this title] only in accordance with a plan of action approved by the Secretary under this subtitle.
 12 U.S.C.A. Sec. 1715l note (Supp.1990) (underscored language added by the Reform Act, Sec. 202(a), 103 Stat. 2037).
 
 
 [7]
 There can be no question that Congress intended the Preservation Act to cover mortgage prepayment. The statute and the legislative history are replete with references to mortgage prepayment. Indeed, subtitle B of the Act is entitled "Prepayment of Mortgages Insured Under National Housing Act." Preservation Act, subtitle B, 101 Stat. 1878. The question remains, however, whether the enacting Congress intended to cover mortgage insurance termination as well as mortgage prepayment